# UNITED STATES DISTRICT COURT

## DISTRICT OF COLORADO

| | |
|---|---|
| JERALD BOYKIN,<br><br>　　　　　　　Plaintiff,<br>　vs.<br>EXPERIAN INFORMATION SOLUTIONS,<br>INC.; EQUIFAX INFORMATION SERVICES,<br>LLC; TRANS UNION, LLC; CREDIT PLUS,<br>LLC.; and BBVA USA BANCSHARES, INC.<br>　　　　　　　Defendants. | Civil Action No.: _____<br><br><br>COMPLAINT FOR VIOLATIONS OF<br>THE FAIR CREDIT REPORTING ACT<br><br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Jerald Boykin ("Plaintiff"), through counsel, brings this action against defendants Experian Information Solutions, Inc. ("Experian"), Equifax Information Services, LLC ("Equifax"), Trans Union, LLC ("TransUnion"), and Credit Plus, Inc. ("CreditPlus") (collectively, "CRA Defendants"), and defendant BBVA USA Bancshares, Inc. ("BBVA") (BBVA and CRA Defendants collectively, "Defendants") and alleges based upon Plaintiff's personal knowledge, the investigation of counsel, and information and belief, as follows:

## NATURE OF THE ACTION

1.　　　Plaintiff's Complaint arises from Defendants' violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq*. Plaintiff contends that CRA Defendants failed to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's consumer reports. "Consumer reports" under 15 U.S.C. § 1681a(d) include both credit file disclosures obtained directly by Plaintiff from the consumer reporting agencies and consumer reports obtained by third parties as a factor in establishing Plaintiff's eligibility for credit.

1

2.      Plaintiff's Complaint also alleges that CRA Defendants violated 15 U.S.C. §1681 *et seq.* by failing to reasonably investigate Plaintiff's consumer disputes, which each resulted in Defendants' reporting inaccurate information about Plaintiff.

3.      Plaintiff's Complaint also alleges that BBVA violated 15 U.S.C. §1681 *et seq*. by failing to conduct a reasonable reinvestigation after receiving notice of Plaintiff's disputes from Equifax, TransUnion, and Experian.

## JURISDICTION AND VENUE

4.      The claims asserted in this complaint arise under 15 U.S.C. §§1681e, 1681i, and 1681s-2(b) of the FCRA.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and 15 U.S.C. §1681p.

5.      Venue is proper in this judicial district under 28 U.S.C. §1391(b).

## PARTIES

6.      Plaintiff resides in Denver, Colorado, and qualifies as a "consumer" as that term is defined under 15 U.S.C. §1681a(c).  Plaintiff is an individual.

7.      Defendant Experian regularly compiles and distributes consumer credit information in exchange for monetary compensation. Therefore, Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is an Ohio corporation that regularly conducts business in this judicial district. Experian maintains a principal place of business at 475 Anton Boulevard, Costa Mesa, CA 92626.

8.      Defendant TransUnion regularly compiles and distributes consumer credit information in exchange for monetary compensation. Therefore, TransUnion is a "consumer

reporting agency" as defined in 15 U.S.C. § 1681a(f). TransUnion is a Delaware corporation that regularly conducts business in this judicial district. Defendant can be served through its registered agent, Prentice Hall Corporation, 801 Adlai Stevenson Drive, Springfield, IL 62703.

9.      Defendant Equifax regularly compiles and distributes consumer credit information in exchange for monetary compensation. Therefore, Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is a Georgia corporation that regularly conducts business in this judicial district. Equifax maintains a principal place of business at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309. Defendant can be served through its registered agent, Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, GA, 30092.

10.     Defendant CreditPlus, LLC regularly compiles and distributes consumer credit information in exchange for monetary compensation. Therefore, CreditPlus is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Credit Plus is also a "reseller" as defined at 15 U.S.C. § 1681a(u) because it resells and furnishes credit information compiled and assembled from other consumer reporting agencies. CreditPlus is a Maryland Corporation that regularly conducts business in this jurisdiction. Credit Plus maintains a principal place of business at 31550 Winterplace Parkway, Salisbury, MD 21804. Defendant can be served through its registered agent, CSC-Lawyers Incorporating Service Company, 7 St. Paul Street, Suite 820, Baltimore MD 21202.

11.     Defendant BBVA has been recently purchased by, and become a subsidiary of, PNC Financial Services Group, Inc. BBVA regularly provides consumer credit information to consumer reporting agencies. Therefore, BBVA is "furnisher" of consumer credit information as that term is contemplated by 15 U.S.C § 1681s-2. BBVA is a foreign corporation that regularly conducts business in this judicial district.  BBVA maintains a principal place of business at 350

North St. Paul Street, Dallas, Texas 75201. Defendant can be served through its registered agent, CT Corporation System, 1999 Bryan St., Ste. 900 Dallas, Tx 75201.

12.     During all times pertinent to this Complaint, Defendants were authorized to conduct business in the State of Colorado and conducted business in the State of Colorado on a routine and systematic basis.

13.     During all times pertinent to this Complaint, Defendants acted through authorized agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and/or insurers.

14.     Any violations by Defendants were not in good faith, were knowing, negligent, willful, and/or intentional, and Defendants did not maintain procedures reasonably adapted to avoid any such violation.

**FACTUAL BACKGROUND**

15.     Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth at length herein.

16.     The United States Congress has found that the banking system is dependent upon fair and accurate credit reporting. Inaccurate consumer reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continual functioning of the banking system.

17.     Congress enacted the FCRA to ensure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy.

18.     The FCRA seeks to ensure consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy because

consumer reporting agencies have assumed such a vital role in assembling and evaluating consumer credit and other consumer information.

19.     CRA Defendants, aside from CreditPlus, are the three major consumer reporting agencies, or credit bureaus, in the United States that regularly publish and distribute credit information about Plaintiff and other consumers through the sale of consumer reports (also known as credit reports).

20.     The CRA Defendants' consumer reports generally contain the following information: (i) Header/Identifying Information: this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers; (ii) Tradeline Information: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status; (iii) Public Record Information: this section typically includes public record information, such as bankruptcy filings; and (iv) Credit Inquiries: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

21.     The CRA Defendants obtain consumer information from various sources. Some consumer information is sent directly to CRA Defendants by furnishers, and other information is independently gathered by CRA Defendants from third party providers/vendors or repositories, like computerized reporting services like PACER and Lexis-Nexis.

22. CRA Defendants regularly seek out and procure public record information, including consumer bankruptcy filing and discharge information, with the intention of including this bankruptcy information on the consumer reports they sell to third parties such as lenders.

23. The diligence CRA Defendants exercise in uncovering and recording consumer bankruptcy filings is not replicated in their subsequent reporting of bankruptcy discharges and their effect on consumers' debts.

24. CRA Defendants' unreasonable policies, procedures and/or algorithms consistently fail to identify and update information related to bankruptcy debts as required by §1681(e)(b).

25. CRA Defendants know the information they report about consumers' bankruptcies is often inconsistent with public records, furnished/reported information, and/or information contained in their own files.

26. The vast majority of institutions that offer financial services (e.g., banks, creditors, lenders) rely upon consumer reports from credit bureaus (like CRA Defendants) to make lending decisions.

27. Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in a consumer's consumer report, which is based on the amount of reported debt, payment history, date of delinquencies contained in Defendant's consumer reports.

28. The information CRA Defendants include in a consumer report contributes to a consumer's overall creditworthiness and determines their FICO Score(s).

29.     FICO and other third-party algorithms use variables or "attributes" derived from a consumer's consumer report to calculate a "credit score," which is a direct reflection of a consumer's creditworthiness.

30.     FICO Scores factor the following consumer report information: Payment history (35%); Amount of debt (30%); Length of credit history (15%); New credit (10%); and Credit mix (10%).

31.     FICO's "Payment history" refers to whether a consumer has paid his or her bills in the past, and whether these payments have been timely, late, or missed. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently the delinquency occurred, and how many delinquent accounts exist. The more severe, recent, and frequent late payments are, the lower a consumer's FICO Score will be.

32.     Defendants know that a consumer report indicating an account delinquency as having occurred more recently will more negatively impact a consumer's credit score and/or FICO Score.

33.     Rather than follow reasonable procedures to assure maximum possible accuracy, as required by the FCRA, CRA Defendants frequently report information regarding post-bankruptcy debts based on incomplete or knowingly inaccurate information.

34.     CRA Defendants' unreasonable policies and procedures cause them to routinely report inaccurate and materially misleading information about consumers, including Plaintiff, related to whether an account has been discharged in bankruptcy.

35.     CRA Defendants routinely report inaccurate and materially misleading information about consumers like Plaintiff, without verifying or updating it as required by § 1681(e)(b), despite

possessing information inconsistent with the reported information, and information that establishes that the reported information is inaccurate.

36.     CRA Defendants' unreasonable policies and procedures cause them to regularly report consumer information without verifying its accuracy.

37.     CRA Defendants' unreasonable policies, procedures and/or algorithms consistently fail to accurately identify bankruptcy debts as required by §1681(e)(b).

38.     CRA Defendants know the information they report about consumers' bankruptcies is often inconsistent with public records, furnished/reported information, and/or information contained in their own files.

39.     CRA Defendants regularly publish consumer information that conflict with information that has been provided by data furnishers, information that is already included in CRA Defendants' own credit files, information contained in public records that CRA Defendants regularly access, and/or information sourced through CRA Defendants' independent and voluntary efforts.

40.     CRA Defendants are on continued notice of their inadequate post-bankruptcy reporting procedures, including pertaining to inaccurate account and payment statuses and failing to verify the status of accounts even after notice from the consumer, through the thousands of lawsuits and FTC and Consumer Financial Protection Bureau complaints filed against them for their inaccurate reporting following a consumer bankruptcy.

**Allegations Specific to the Credit Reporting of Plaintiff**

41.     Plaintiff filed a Chapter 13 Bankruptcy on or about July 3, 2019, in the United States Bankruptcy Court for the District of Colorado (Case No. 1:19-bk-15783).

42.     Plaintiff Jerald Boykin and his spouse, Theresa (the "Boykins"), are senior citizens and long-time residents of Aurora, in Denver, Colorado.

43.     The Boykins have been dreaming about living in a home of their own for many years. Aside from the usual joy in finally purchasing a home, the Boykins were timebound to find a place of residence before their tenancy would expire; the Boykins' landlord was selling the property and the Boykins were forced to secure another place of residence.

44.     The Boykins are still in the midst of bankruptcy proceedings, and Plaintiff's debts have not yet been discharged.

45.     The Boykins were determined to rehabilitate their credit and overcome the negative bankruptcy.

46.     Soon after, upon advice of a friend, Plaintiff procured the services of Oakwood Homes' homebuying assistance program. Oakwood Homes is a Berkshire Hathaway company.

47.     An Oakwood Homes counselor advised the Boykins that, typically, home-buying opportunities would increase approximately a year after a Chapter 13 bankruptcy was filed. The counselor further advised on how to facilitate and maintain an adequate credit score to qualify for mortgage opportunities.

48.     Pursuant to the counselor's suggestion, Plaintiff opened a BBVA credit account on or about May 11, 2020.

49.     The Boykins carefully monitored, guarded, and nurtured Plaintiff's credit score so that they could soon qualify for a mortgage and finally purchase their own home.

50.     Plaintiff has made timely and monthly payments on the BBVA account, and Plaintiff continues to make such timely and monthly payments to this day, in order to improve his credit score.

51.     As advised, approximately a year after the bankruptcy and after the BBVA account had matured, in or around August 2020, the Boykins began seriously searching for a suitable home. After a months' long and arduous search, the Boykins focused in on a particular home being constructed by Oakwood Homes. The home was still being constructed, but was centrally located for their needs, was in a seniors' community, was in their familiar Aurora, Colorado, and was also affordable.

52.     On March 24, 2021, the Boykins' mortgage application (jointly with two additional family members) was pre-approved by Nest Home Lending, LLC ("Nest").

53.     Five days later, the Boykins entered contract for their dream home. The contract conditioned home-buying on securing a mortgage, and the Boykins were confident that their mortgage was a done-deal. The Boykins paid a $6,000 deposit and anticipated the fast-approaching move.  The Boykins were scheduled to close on their new home in or around August 2021, by which time construction on their home was to be completed.

**Defendants' Violations Interfere to Deprive Plaintiff of a Home**

54.     However, at the worst possible moment, Defendants' violations intervened to scuttle the deal and obliterate the Boykins' dream.

55.     On or about May 1, 2021, Plaintiff received an alert from PrivacyGuard, a credit tracking service, that his credit score was reduced.

56.     The Boykins' were gravely concerned.  A credit score reduction could potentially render the Boykins ineligible for the mortgage and lead to termination of the contract. After all, Nest, as any mortgage lender, would check the applicants' credit before granting the mortgage loan.

57.     Upon a check of his credit accounts, Plaintiff noticed that the BBVA account was reporting as "closed."

58.     Immediately, on the same day of May 1, 2021, Plaintiff telephoned BBVA and disputed its inaccurate reporting and urged it to fix its reporting because the account was open, not closed.

59.     On the phone, BBVA explained that it was not aware that the account had been marked as "closed," but agreed to open a "ticket" and investigate.

60.     Just a few days after Plaintiff disputed the reporting of the BBVA account, Plaintiff noticed that the BBVA account reporting had changed; however, instead of the reporting being corrected, the BBVA account was reporting that the account had been discharged in bankruptcy.

61.     Specifically, Equifax, Experian, TransUnion, and CreditPlus were each inaccurately reporting the BBVA account as having been included in bankruptcy. The Boykins' concern turned to alarm.

**Plaintiff's further disputes with BBVA and Equifax, TransUnion, and Experian**

62.     On or about May 26, 2021, Plaintiff contacted BBVA to dispute its reporting and request that it no longer inaccurately report its account as in bankruptcy.

63.     Plaintiff also emailed Clarice Vick ("Clarice") a Client Care Analyst at BBVA.  In the email, disputed BBVA's reporting and requested that it no longer inaccurately report its

account as included in bankruptcy. Plaintiff also provided an original Experian consumer report demonstrating the inaccurate BBVA reporting.

64.     Clarice assured Plaintiff that she would look into the error and if it was something BBVA had done, she would fix the inaccurate reporting.

65.     On or about June 1, 2021, Clarice notified Plaintiff that she had requested that CRA Defendants correct the reporting.

66.     BBVA also responded by letter dated June 1, 2021. In the letter, BBVA apologized for "any inconvenience this may have caused" and represented that it had "made an electronic request to Equifax, Experian, and TransUnion," and these credit bureaus should report the account as "CURRENT STATUS."

67.     On or about June 10, 2021, Plaintiff received an alert from PrivacyGuard, a credit tracking service, that BBVA had again reported Plaintiff's account as included in bankruptcy.

68.     On the same date, Plaintiff emailed Garret Tillotson ("Garret") a Financial Solutions Consultant at BBVA.  In the email, Plaintiff explained that BBVA's inaccurate reporting has the potential to severely harm Plaintiff and requested that BBVA immediately correct its erroneous reporting.

69.     Garret is Plaintiff's local banker, and had helped Plaintiff open the BBVA originally.

70.     In an emailed response on the same date, Garret assured Plaintiff that he had "submitted a ticket to resolve the issue," and offered to provide Plaintiff's mortgage broker a "letter of explanation . . . stating that the account/card is not a part of the 2019 chapter 13 filing, and is/has been in good standing since being opened in 2020."

71.     Upon information and belief, Plaintiff's credit score had dropped approximately 40 to 60 points due to BBVA and CRA Defendants' inaccurate reporting.

72.     Although doubtful as to its efficacy, Plaintiff graciously accepted Garret's offer and awaited the promised "letter of explanation."

73.     Plaintiff has yet to receive such a letter.

74.     BBVA responded to Plaintiff by letter dated June 15, 2021. In the letter, BBVA apologized for "any inconvenience this has caused you" and represented that "an electronic request has been submitted to Equifax, Experian, TransUnion, and Innovis," that such credit bureaus should report the account as "current with no payment delinquencies," and that the "consumer information indicator field should no longer reflect Petition for Ch 13 Bankruptcy."

75.     Reporting the BBVA account as included in bankruptcy is inaccurate because the BBVA account was not closed, nor discharged in bankruptcy.

76.     The BBVA account was opened nearly a year after Plaintiff filed for bankruptcy, and Plaintiff has consistently made timely monthly payments.

77.     Plaintiff continues to make timely monthly payments on his BBVA account.

78.     Notably, Plaintiff's bankruptcy has yet to be discharged. Accordingly, the BBVA account could not have been discharged in bankruptcy.

79.     Having had no success with BBVA, Plaintiff turned to the credit bureaus directly.

80.     On or about June 14, 2021, Plaintiff submitted written dispute letters to TransUnion, Equifax, and Experian disputing their inaccurate reporting of the BBVA account.

81.     The letters specifically advised that the BBVA account was open, current, and not included in bankruptcy.

82.     Plaintiff further explained that he was in the process of obtaining a mortgage, and that the inaccuracy was harming his credit score and ability to obtain such mortgage.

83.     Plaintiff requested that each credit bureau remove the inaccurate information.

84.     Upon information and belief, TransUnion, Equifax, and Experian each received Plaintiff's dispute letters.

85.     Upon information and belief, TransUnion, Equifax, and Experian each forwarded Plaintiff's disputes to BBVA within five business days of receiving Plaintiff's dispute, as required by federal statute.

86.     Upon information and belief, BBVA received Plaintiff's dispute from each of TransUnion, Experian, and Equifax.

**Defendants' Continuing Violations and Ongoing Harm**

87.     As of August 17, 2021, Experian's consumer report was still reporting the BBVA account with an account status of "closed," but had changed the payment status to indicate: "Debt included in or discharged through Bankruptcy Chapter 13."

88.     In the "Payment history" grid, Experian included a "BK" notation in field belonging to the month of May 2021.

89.     Experian defines "BK" as having the meaning "Chapter 13 bankruptcy" in its consumer report.

90.     As of August 27, 2021, TransUnion's consumer report listed the BBVA account under the consumer report section entitled "Account with Adverse Information."

14

91.     Further, while TransUnion is reporting the BBVA account with a "pay status" of "Current Account," it also, confusingly, indicates in the "Remarks" field "CHAPTER 13 BANKRUPTCY."

92.     TransUnion's consumer report also failed to indicate any balance in the "balance" field.

93.     Finally, although the TransUnion consumer report was accessed on, and dated, August 27, 2021, the BBVA account payment history grid indicated timely payments only until and including the month of May 2021. No further months are indicated.

94.     CreditPlus also is inaccurately reporting the BBVA account as having been included in bankruptcy.

95.     As of June 2021, CreditPlus's consumer report reported the BBVA account status as "BANKRUPTCY."

96.     A CreditPlus comment on the account contains the following remark: "WAGE EARNER PLAN ACCOUNT (CHAPTER 13); SECURED."

97.     CRA Defendants each reported Plaintiff's bankruptcy filing (date/court/chapter) in both the Public Records section, as well as in some individual tradelines of Plaintiff's consumer reports.

98.     CRA Defendants obtained notice of Plaintiff's bankruptcy through their routine, independent collection of consumer information from third party vendors such as Lexis-Nexis, as well as from furnishers that provide data regarding the individual tradelines reported by CRA Defendants in Plaintiff's consumer reports.

99.     Rather than accurately report the BBVA account as open and current, CRA Defendants inaccurately reported Plaintiff's BBVA account as included in bankruptcy.

100.    Since the account was clearly indicated to all of the credit reporting agencies that it was opened long after the Chapter 13 bankruptcy had been filed, each of CRA Defendants knew that the BBVA account could not be included in the bankruptcy plan.

101.    Each of CRA Defendants also received direct information from BBVA that the account was in good standing.

102.    Upon information and belief, Plaintiff's credit score had dropped approximately 40 to 60 points due to BBVA and CRA Defendants' inaccurate reporting.

103.    At the time of the Boykins' mortgage pre-approval, Plaintiff's credit score was the highest of the four joint applicants. However, after Defendants' violations, Plaintiff's credit score was now the lowest of the four.

104.    Plaintiff was informed that no longer qualified for Nest's mortgage.  Plaintiff searched for other mortgages, but was unsuccessful due to his reduced credit score.

105.    113.    On or about July 7, 2021, Plaintiff applied to American Financing Corporation ("American") for a mortgage loan. American, through Partners Credit & Verification Solutions, procured Plaintiff's Equifax and TransUnion consumer reports.

106.    American denied Plaintiff's mortgage application because he lacked an adequate credit score.

107.    On July 13, 2021, Oakwood Homes terminated the Boykins' home contract because the Boykins had failed to secure the requisite mortgage.

108.   Plaintiff received Nest's Statement of Action Taken letter on or about August 12, 2021. The Nest letter advised that Plaintiff would not be granted a mortgage loan, and that the decision is based upon credit information from CreditPlus and TransUnion.

109.   Since Nest's denial, the Boykins have searched for other homes, and even for home rentals, but were repeatedly denied due to Plaintiff's lower credit score.

110.   On or about August 11, 2021, Plaintiff applied to Edge Home Finance Corporation ("Edge") for a mortgage loan. Edge, through Advantage Credit, Inc., procured Plaintiff's Experian, Equifax, and TransUnion consumer reports.

111.   Edge then denied Plaintiff's mortgage application.

112.   Nest, American, and Edge each denied Plaintiff's mortgage loan applications due to Defendants' inaccurate reporting of the BBVA account on their respective consumer reports.

113.   To this day, the Boykins are still searching for a residence.

114.   As iterated hereinabove, as of August 17, 2021, Experian has yet to correct its reporting and is still inaccurately reporting the BBVA account as it related to bankruptcy.

115.   As iterated hereinabove, as of August 27, 2021, TransUnion has yet to correct its reporting and is still inaccurately reporting the BBVA account as it related to bankruptcy.

116.   By contrast, as of August 13, 2021, Equifax has corrected its reporting and its accurately reporting the BBVA account.

117.   Crucially, while Equifax has produced a consumer report that was accurately reporting the BBVA account as of on or about August 13, 2021, Equifax had been inaccurately reporting the account when Plaintiff needed it most: at the time he was attempting to obtain a mortgage loan while in contract for a home.

118.   Equifax's failure to comply with its obligations under the FCRA caused Plaintiff harm.

119.   Upon information and belief, Plaintiff remains concerned that the inaccurate BBVA account information will reappear on Plaintiff's Equifax consumer report.

120.   Plaintiff does not have knowledge as to Equifax's current reporting of the BBVA account at the time of filing this complaint.

121.   Upon information and belief, BBVA is still furnishing inaccurate BBVA account information to the credit bureaus, including CRA Defendants.

**Further Damages**

122.   Upon information and belief, had Defendants accurately reported the BBVA account as open and current, Plaintiff's credit score would have been higher and sufficient to qualify for a mortgage loan.

123.   As a direct result of the Defendants' inaccurate reporting, Plaintiff was no longer qualified for the mortgage loan for which he had been pre-approved.

124.   As a direct result of the Defendants' inaccurate reporting, Plaintiff was no longer qualified for any mortgage loan that could have saved the home contract from termination.

125.   Plaintiff was denied the mortgage loan because his credit score was below the qualifying threshold.

126.   Plaintiff was informed that his mortgage loan application would have been approved had his credit score been slightly higher.

127.   Plaintiff shopped around for additional mortgage loans to salvage his home contract, but did not qualify because his credit score was too low.

128.    As a direct result of the Defendants' inaccurate reporting, Plaintiff was forced to forego the purchase of a home for which he had entered contract.

129.    Upon information and belief, recent dramatic rises in home prices in the Denver, CO, housing market has rendered the purchase of the contracted-for home unaffordable and impracticable for the Plaintiff.

130.    Upon information and belief, to purchase the contracted-for home would now require an additional $50,000.00.

131.    Upon information and belief, recent dramatic rises in home prices in the Denver, CO, housing market has rendered the purchase of other homes unaffordable and impracticable for Plaintiff.

132.    The Boykins were on the cusp of fulfilling a long-held dream of purchasing a living in a home of their own; their dream was suddenly made possible by virtue of a confluence of factors, such as government stimulus funds, new home construction, and Plaintiff's bankruptcy and subsequent credit-rehabilitation, among others, to culminate in the Boykins' entering contract on an affordable and suitable home.

133.    Defendants' actions have deprived the Boykins of that dream.

134.    On or about October 15, 2021, Plaintiff was notified by his landlord that, because the landlord intends to sell the property where Plaintiff currently resides, Plaintiff had 45 days by which time he must vacate the property.

135.    As a direct result of the Defendants' inaccurate reporting, Plaintiff suffered and suffers damages, including a decreased credit score, lower overall creditworthiness, and other financial harm.

136.     Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish, humiliation, stress, anger, sleepless nights, reputational damage, frustration, shock, embarrassment, violation of Plaintiff's right to privacy, and anxiety.

## CAUSES OF ACTION

### COUNT I

### Against CRA Defendants for Violating 15 U.S.C. §1681e(b)

137.     Plaintiff repeats and realleges the foregoing allegations if set forth in full herein.

138.     The FCRA imposes a duty on credit reporting agencies to devise and implement procedures to assure the "maximum possible accuracy" of credit reports, as follows:

> *Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure **maximum possible accuracy** of the information concerning the individual about whom the report relates.*

15 U.S.C. §1681e(b) (emphasis added).

139.     CRA Defendants each failed to follow reasonable procedures to ensure maximum possible accuracy of the information reported on Plaintiff's consumer reports.

140.     CRA Defendants each violated 15 U.S.C. §1681e(b) by failing to establish and/or follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's consumer reports and credit files it published and maintained concerning Plaintiff.

141.     As a result of each of CRA Defendants' statutory violations, Plaintiff suffered actual damages as described hereinabove.

142.    Each of CRA Defendants' violations were willful, rendering each of CRA Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n.

143.    In the alternative, each of CRA Defendants were negligent, which entitles the Plaintiff to recovery under 15 U.S.C. §1681o.

144.    Plaintiff is entitled to recover actual damages, statutory damages, costs and attorney's fees from CRA Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n and §1681o.

## COUNT II

**Against Equifax, TransUnion, and Experian for Violating 15 U.S.C. §1681i**

145.    Equifax, TransUnion, and Experian each violated 15 U.S.C. §1681i(a)(1) by failing to conduct a reasonable reinvestigation to determine whether the disputed information was accurate and record the current status of the disputed information or delete the item from Plaintiff's consumer report and credit file.

146.    As more fully alleged hereinabove, Plaintiff repeatedly communicated to each of Equifax, TransUnion, and Experian that each was inaccurately reporting the BBVA account, and repeatedly explained why and how such reporting was inaccurate.

147.    Nevertheless, Equifax, TransUnion, and Experian each continued, and continue, to report and publish the inaccurate credit information.

148.    Equifax, TransUnion, and Experian each violated 15 U.S.C. §1681i(a)(2)(A) by failing to provide BBVA with all of the relevant information regarding Plaintiff and his dispute.

149.    Equifax, TransUnion, and Experian each violated 15 U.S.C. §1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate information from Plaintiff's credit file or correct the inaccurate information upon reinvestigation.

150.    Equifax, TransUnion, and Experian each violated 15 U.S.C. §1681i(a)(6)(A)-(B) by failing to provide to Plaintiff "written notice . . . of the results of a reinvestigation," a consumer report revised pursuant to the results of the reinvestigation, and other requisite notifications required by 15 U.S.C. §1681i(a)(6)(A)-(B).

151.    As a result of each of Equifax, TransUnion, and Experian' respective statutory violations, Plaintiff suffered actual damages as described hereinabove.

152.    Each of Equifax, TransUnion, and Experian respective violations were willful, rendering Equifax, TransUnion, and Experian each individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n.

153.    In the alternative, each of Equifax, TransUnion, and Experian was negligent, which entitles the Plaintiff to recovery under 15 U.S.C. §1681o.

154.    Plaintiff is entitled to recover actual damages, statutory damages, costs and attorney's fees from each of Equifax, TransUnion, and Experian in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n and §1681o.

**COUNT III**

**Against BBVA for Violating 15 U.S.C. §1681s-2(b)**

155.    Plaintiff repeats and realleges the foregoing allegations if set forth in full herein.

156.    After a consumer submits a dispute to a consumer reporting agency, such consumer reporting agency is required to notify the furnisher of the disputed information of the dispute.

157.    Therefore, each time Plaintiff submitted a dispute to any credit bureau, each credit bureau, in turn and as required by federal statute, notified BBVA of Plaintiff's dispute.

158.    Upon receiving notice of a dispute from a credit reporting agency, furnishers are required to conduct an investigation and correct the misleading information as necessary, as follows:

> After receiving notice pursuant to 15 U.S.C. § 1681i(a)(2) of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall –
>
> (A)    conduct an investigation with respect to disputed information;
>
> (B)    review all relevant information provided by the consumer reporting agency pursuant to § 1681i(a)(2) of this title;
>
> (C)    report the results of the investigation to the consumer reporting agency; [and]
>
> (D)    if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information…
>
> 15 U.S.C. §1681s-2(b) (emphasis added).

159.    BBVA received notice of each of Plaintiff's disputes to each credit bureau, including Equifax, TransUnion, and Experian, and still failed to comply with its obligations under the FCRA.

160.    BBVA failed to conduct a timely and reasonable investigation of Plaintiff's dispute after receiving notice thereof from each credit bureau, including Equifax, TransUnion, and Experian.

161.    BBVA willfully, intentionally, recklessly, and/or negligently continued to report inaccurate information to credit bureaus, including CRA Defendants.

23

162.    Instead of removing the inaccurate information, BBVA improperly verified that the reporting was accurate.

163.    Worse still, even *after BBVA admitted to Plaintiff that its reporting was inaccurate*, BBVA willfully, intentionally, recklessly, and/or negligently continued to furnish inaccurate BBVA account information to the credit bureaus, including CRA Defendants, on *at least four occasions*, between the months of June and September of 2021.

164.    Upon information and belief, BBVA is continuing to furnish such inaccurate information, despite repeatedly admitting to Plaintiff that such reporting was inaccurate.

165.    As a result of BBVA's misconduct, Plaintiff has suffered actual damages as described herein.

166.    BBVA's misconduct was a direct and proximate cause of Plaintiff's damages.

167.    As a result of BBVA's statutory violations, Plaintiff suffered statutory and actual damages as described herein and is entitled to recover statutory, actual, and punitive damages under 15 U.S.C. §1681n and §1681o.

## JURY DEMAND

Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter judgments against Defendants for the following:

(a)    Declaratory judgment that Defendants violated 15 U.S.C. §1681e(b);

(b)    An award of actual damages pursuant to 15 U.S.C. §§1681n(a)(1) or 1681o(a)(1);

(c)     An award of statutory damages pursuant to 15 U.S.C. §§1681n(a)(1) and1681o(a)(1);

(d)     An award of punitive damages, as allowed by the Court pursuant to 15 U.S.C. §1681n(a)(2),

(e)     Costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1681n(a)(3) and §1681o(a)(2); and

(f)     Such other and further relief as this Honorable Court may deem just and proper, including any applicable pre-judgment and post-judgment interest, and/or declaratory relief.

DATED: October 28, 2021                     **THE CONSUMER JUSTICE LAW FIRM**

*/s/ David A. Chami*
DAVID A. CHAMI, Bar No. 027585
8245 N. 85th Way
Scottsdale, AZ 85258
dchami@cjl.law
*Attorneys for Plaintiff*